**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **EDISON ZORILLA, Individually and** | § | |
| **on behalf of all others similarly** | § | |
| **situated** | § | |
| | § | |
| **VS.** | § | **C.A. NO. 4:16-cv-615** |
| | § | |
| | § | |
| **UBER TECHNOLOGIES, INC.** | § | **JURY DEMANDED** |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ANDREW MICHAEL BERMAN,** | § | |
| **EUGENE RODRIGUEZ, JEROD** | § | |
| **SLAY, KENNAN VALES, DAWIT** | § | |
| **GEBREMARIAM, ALADDIN AFIA,** | § | |
| **KHALIL ANIBOU, HARGEWEYNI** | § | |
| **DAWIT, MARSHALL DEVON ISOM,** | § | |
| **RICHARD SCHUSTERMAN,** | § | |
| **ASHAGARI HABTEGABRIEL,** | § | |
| **MICHAEL LEYZERZON, ROMALE** | § | |
| **WALKER, SAMMY IBOK, GARY** | § | |
| **LASSIN, GLEN DEWALT, CHAN** | § | |
| **ZULFIQUAR, ROBERT NIETO, and** | § | |
| **THEOPHILUS DUCKETT, Individually** | § | |
| **and on behalf of all others similarly** | § | |
| **situated** | § | |
| | § | |
| **VS.** | § | **C.A. NO. 4:17-CV-2011** |
| | § | |
| | § | |
| **UBER TECHNOLOGIES, INC.** | § | **JURY DEMANDED** |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

     COME NOW, Plaintiffs **ANDREW MICHAEL BERMAN, EUGENE RODRIGUEZ,**

**JEROD SLAY, DAWIT GEBREMARIAM, ALADDIN AFIA, ASHAGARI**

**HABTEGABRIEL, MICHAEL LEYZERZON, ROMALE WALKER,** and **ROBERT NIETO,** Individually and on behalf of all others similarly situated[1], (hereinafter collectively referred to as "Plaintiffs")**,** complaining of **UBER TECHNOLOGIES, INC.** (hereinafter referred to as "Defendant" or "Uber"), and in support thereof would respectfully show unto the court as follows:

## NATURE OF SUIT

1.      Plaintiffs' claims arise under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219 ("FLSA").

2.      The FLSA was enacted to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers … ." 29 U.S.C. § 202(a).  To achieve its humanitarian goals, the FLSA defines appropriate pay deductions and sets overtime pay, minimum wage, and recordkeeping requirements for covered employers.  29 U.S.C. §§ 206(a), 207(a), 211(c).

3.      Defendant violated the FLSA by employing Plaintiffs and other similarly situated nonexempt employees "for a workweek longer than forty hours [but refusing to compensate them] for [their] employment in excess of [forty] hours … at a rate not less than one and one-half times the regular rate at which [they are or were] employed." 29 U.S.C. § 207(a)(1).

4.      Defendant violated the FLSA by failing to maintain accurate time and pay records for Plaintiffs and other similarly situated nonexempt employees as required by 29 U.S.C. § 211(c) and 29 C.F.R. pt. 516.

---

[1] All named Plaintiffs are individuals who have opted out of the Arbitration Clause contained in all of Uber's driver agreements and thus can proceed with their claims in this forum and not through arbitration. Moreover, Kennan Vales and Richard Schusterman have opted out of this lawsuit and joined the collective action pending in North Carolina.

5.      Plaintiffs bring this collective action under 29 U.S.C. § 216(b) on behalf of themselves and all other similarly situated employees to recover minimum wage and overtime wages.

6.      Plaintiff further allege the following causes of action under Texas and/or federal law and statute: 1) fraud and fraud in the inducement in driver recruitment and daily operations; 2) unjust enrichment for the wrongful retention of toll charges and failure to properly compensate drivers for related expenses for their vehicles such as gas, additional insurance, maintenance costs, licensing fees, and certification fees all of which should be reimbursed by/paid for by Uber; 3) various violations and omissions with regard to the Form 1099's issued to the drivers; and 4) breach of contract for wrongful retention of toll charges and other expenses incurred by the drivers in furtherance of their contractual obligations with Uber pursuant to the various agreements in place.

## **CASE SUMMARY**

7.      Defendant, Uber, misclassified their employees as independent contractors to avoid paying minimum wage and overtime per the FLSA.

8.      Uber did not pay their workers minimum wage and/or overtime as required pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA").  Plaintiffs worked over forty (40) per week.  However, the facts of this case will show that the workers/ employees are not independent contractors, and are owed minimum wage and overtime pay.  This action seeks to recover all unpaid wages/compensation, liquidated damages, statutory damages, attorney's fees and costs owed to Plaintiffs for their individual claims, and collectively on behalf of all others similarly situated.

## JURISDICTION AND VENUE

9.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. 216(a) and (b) of the FLSA.  Moreover, this Court has jurisdiction pursuant to 28 U.S.C. §1332 as Plaintiffs and those similarly situated are residents of Texas and Defendant is a Delaware corporation with its principal place of business in California and who is authorized to do business in the State of Texas. Additionally, venue lies in this Court under 28 U.S.C. §1391 as the causes of action alleged herein are based upon actions and activities that substantially took place at all relevant times in the Houston Division of the Southern District of Texas.  By reason thereof, the jurisdiction and venue of this action is proper in any federal district court in the Southern District of Texas. Furthermore, the matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. §1331 and accordingly, jurisdiction is proper before this court. All parties are subject to personal jurisdiction in the Southern District of Texas.

## PARTIES

10.     Plaintiffs **ANDREW MICHAEL BERMAN, EUGENE RODRIGUEZ, JEROD SLAY, DAWIT GEBREMARIAM, ALADDIN AFIA, ASHAGARI HABTEGABRIEL, MICHAEL LEYZERZON, ROMALE WALKER,** and **ROBERT NIETO** are former and current employees of Uber, and are represented by the undersigned.

11.     Defendant **UBER TECHNOLOGIES, INC.** is a Delaware corporation with its principal place of business located in San Francisco, California. At all relevant times, it was authorized to do business in the State of Texas. It may be served with process by serving its attorneys of record. Uber employed Plaintiffs, and with respect to the Plaintiffs, Uber is subject to the FLSA, as it was at all relevant times and/or was part of an enterprise engaged in interstate commerce as defined by 29 U.S.C. §§ 203(r) and (s).

4

12.    The Class Members are similarly situated Uber drivers, who worked for Uber during the last three years.

## INTRODUCTORY FACTS

13.    This case is brought on behalf of individuals who have worked as Uber drivers in Texas. When agreeing to become drivers for Uber, Plaintiffs and all others similarly situated are required to enter into agreements all drafted unilaterally by Uber and all of which are consistently revised by Uber, also unilaterally.

14.    Uber is a car service established in 2009 in California, that has engaged thousands of drivers across various states, including Texas, to transport riders through its Uber Black, Uber Select, and UberX services. Drivers can be hailed and dispatched through a mobile phone application which is maintained and operated by Uber. All UberX drivers are required to agree to the terms of a form contract, which governs their terms and conditions of their employment. Uber Black and Uber Select drivers have been required to sign a similar contract with Uber. In order to access the form, the Plaintiff must use a smartphone or electronic device. Upon accessing the Uber Driver App, Plaintiffs are required to sign an agreement, entitled "Transportation Provider Service Agreement" which contain arbitration provisions.

15.    Plaintiffs bring this action on their own behalf, and on behalf of other similarly situated Uber drivers, alleging the following causes of action under Texas and/or federal law and statute as alleged herein.

16.    Under Texas law, an independent contractor is one "who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details." Plaintiffs contend that the credible evidence, as shown below, establishes that Uber exercises

sufficient supervision, direction or control over them so as to establish an employer-employee relationship and therefore the applicability of the FLSA to Plaintiffs:

    a.    Uber exercises control through its in-person assistance and where it also provided Claimants with its handbook and signage.

    b.    Uber exercises control through its Driver App by providing the app and setting up the information that appears on the app, by setting the fares charged to riders, by setting the rate of pay to Claimants and the occasional income guarantee, by setting the various incentives and promotions, and by setting the music, tipping and deactivation policies.

    c.    Uber assigns the work by dispatching trip requests to Claimants who must accept the dispatch within Uber's 15-second mandate.

    d.    Uber provides the requisite tools, such as built-in maps on the Driver App and Uber signage.

    e.    Uber conducts an occasional "ID check" on the Driver App and sets the order of riders' drop off for UberPOOL.

    f.    Uber provides in-person support to Claimants and monitoring Claimants' performance, solely determining when and how long to deactivate Claimants for failing to meet Uber's performance standards.

    g.    Uber fields complaints and regularly communicates feedback to Claimants, including the minimum threshold star rating to avoid suspension, and communicates the trip's most efficient route and Claimants' acceleration, braking, and overall speed.

    h.    Uber handles all the bookkeeping activities of the relationship, including

collecting fares and charges from riders, adjusting for mandatory pay deductions, and paying Claimants directly.

i.     Uber not only guarantees payment for each trip, but occasionally guarantees a specified level of income.

j.     Uber requires that Claimants view the "essential" onboarding video provided by Uber and provided Claimants with welcome packets, vehicle placards, and financial incentives and promotions.

k.     Uber maintains numerous driver data and regularly communicates expectations to Claimants.

l.     Uber sets the minimum star-rating threshold performance and utilizes the performance scores and the riders' feedback and complaints in deactivating Driver Apps as a result of inability to meet Uber's satisfactory level of quality.

m.     Uber unilaterally determines whether to collect a rider's cancellation fee.

n.     Uber has the ultimate and sole authority to penalize Claimants if too many trip requests are rejected or ignored.

o.     Uber imposes a list of acceptable vehicles and the route requested by a rider or the GPS route, strongly suggests a dress code, and supplies placards and lights with its logo.,

p.     Uber markets its transportation services to Claimants and riders alike, selects only qualified drivers such as Claimants, monitors and supervises Claimants' performance, rewards high performing drivers, disciplines drivers who fail to meet Uber's standards on a temporary or permanent

basis, sets the fare prices charged to riders, and sets the fee paid to Uber by the riders.

q.      Uber mandates each rider to rate Claimants under Uber's 5-star rating and give written feedback of Claimants' performance, which is then utilized to monitor and discipline Claimants, including suspending or terminating their relationship.

r.      Effectively, Uber utilizes riders' ratings and feedback as one of various tools with which to gauge and otherwise monitor Claimants' performance including cleanliness, professional attire, and driving manner.

17.     The degree of control and micromanaging exerted by Uber over the daily activities of its driver such as Plaintiffs is monumental and mindblowing. The relationship between the Plaintiffs as drivers and Uber is clearly that of employer-employee. By misclassifying Plaintiffs as independent contractors, Uber is depriving Plaintiffs of those benefits and protections afforded employees under the law. These include but are not limited to a minimum wage, overtime wages, expense reimbursement, and health and unemployment insurance and benefits. Plaintiffs have been severely damaged as a result of being misclassified as independent contractors by Uber for which they now seek recovery.

18.     As alleged herein, Uber employs Plaintiffs as drivers but then misclassifies them as independent contractors. Plaintiffs are actually employees, and all worked in excess of 40 hours per week.

19.     Plaintiffs were not paid on a salary or fee basis. As defined and set forth in 29 C.F.R. § 541, none of Plaintiffs served in the capacity of executive, administrator, professional or

outside sales representative. Therefore, Plaintiffs are not exempt from the protections provided under the FLSA.

20.     Uber employed and/or jointly employed Plaintiffs and the Class Members. At all times relevant hereto, Uber knew of, approved of, and benefited from Plaintiffs' regular and overtime work.

21.     Uber's gross annual revenues have well exceeded the FLSA's $500,000.00 threshold for enterprise coverage for at least each of the last three years.

22.     Uber's employees routinely used vehicles, tools, equipment, telephones, and computers.

23.     Uber is a covered enterprise under the FLSA during at least each of the last three years because they met the $500,000.00 gross revenue threshold, and because their employees used, handled, or worked on goods or materials that were produced for interstate commerce or actually traveled in interstate commerce.

24.     Uber determined the hours Plaintiffs and Class Members worked.

25.     Uber determined Plaintiffs' and Class Members' duties as well as the work locations.

26.     Uber made personnel and payroll decisions, including Plaintiffs' and the Class Members' pay rates, their job assignments, and the decision to not pay them minimum wage or overtime.

27.     Uber had the power to hire and fire Plaintiffs and Class Members.

28.     Plaintiffs and Class Members regularly worked more than forty (40) hours in a workweek.  Uber did not pay them the extra time and a half required pursuant to the FLSA.

29.     Uber knew Plaintiffs and Class Members worked over forty (40) hours per week and that they did not receive overtime pay.

## FLSA INDIVIDUAL CLAIMS

30.     Plaintiffs **ANDREW MICHAEL BERMAN, EUGENE RODRIGUEZ, JEROD SLAY, DAWIT GEBREMARIAM, ALADDIN AFIA, ASHAGARI HABTEGABRIEL, MICHAEL LEYZERZON, ROMALE WALKER,** and **ROBERT NIETO** worked more than 40 hours per week.

31.     After deducting employment related expenses, Plaintiffs **ANDREW MICHAEL BERMAN, EUGENE RODRIGUEZ, JEROD SLAY, DAWIT GEBREMARIAM, ALADDIN AFIA, ASHAGARI HABTEGABRIEL, MICHAEL LEYZERZON, ROMALE WALKER,** and **ROBERT NIETO** made less than minimum wage.

32.     Plaintiffs **ANDREW MICHAEL BERMAN, EUGENE RODRIGUEZ, JEROD SLAY, DAWIT GEBREMARIAM, ALADDIN AFIA, ASHAGARI HABTEGABRIEL, MICHAEL LEYZERZON, ROMALE WALKER,** and **ROBERT NIETO** were misclassified as an independent contractor.

33.     Plaintiffs **ANDREW MICHAEL BERMAN, EUGENE RODRIGUEZ, JEROD SLAY, DAWIT GEBREMARIAM, ALADDIN AFIA, ASHAGARI HABTEGABRIEL, MICHAEL LEYZERZON, ROMALE WALKER,** and **ROBERT NIETO** were not paid overtime.

## COLLECTIVE ACTION ALLEGATIONS

34.     In addition to the above Plaintiffs, Uber employs many other drivers who were also not properly paid under the FLSA for minimum wage and overtime pay, and who were misclassified. These workers are entitled to minimum wage and overtime pay for the same reasons

as Plaintiffs, and are therefore similarly situated to Plaintiffs. These workers are collectively referred to as the "Class Members."

35.     Thousands of these employees/drivers have worked for Uber over the last few years. Accordingly, Uber's failure to pay properly due and owing FLSA compensation extends well beyond the Plaintiffs listed herein.

36.     Pursuant to 29 U.S.C. § 216(b), these Class Members should be notified of this action and given the opportunity to join.  Therefore, the class is properly defined as.

**Uber drivers who have not agreed to an arbitration agreement, have not opted out of the arbitration agreement, and who in the past three (3) years were drivers for Uber**.

37.     Accordingly, Plaintiffs move that the Court certify this matter as a collective matter and request that notice be provided to all similarly situated claimants.

## CAUSE OF ACTION

38.     By failing to pay Plaintiffs and the Class Members minimum wage and overtime at one-and-one-half times the minimum wage rate, Defendant violated the FLSA's employee pay provisions.

39.     Uber owes Plaintiffs and the Class Members the difference between the money paid to them and what should have been paid under the FLSA.  Since Uber's conduct was willful and/or Uber knew and/or showed reckless disregard that their pay practices violated the FLSA, Uber owes these Plaintiffs and class members wages for at least the past three years.

40.     Uber is liable to Plaintiffs and the Class Members for an amount equal to all unpaid FLSA wages, penalties, fees, and all other damages allowed by law.

41.     Plaintiffs and Class Members are entitled to recover all reasonable attorneys' fees and costs incurred in this action.

## CONSENT TO COLLECTIVE ACTION

42.      Each of the named Plaintiffs in this Complaint not only intends to pursue their claims individually, but also consents to be included as a plaintiff in any collective action that may be approved by this Court.  All named Plaintiffs in this Complaint hereby consent to any collective action, and respectfully requests that this honorable Court recognize this written consent as their written consent, to the extent required by law, to be a party to a collective action.  If, for any reason, the Court denies the collective action claims, or any other arguments or allegations are made to defeat the collective action, then all named Plaintiffs still wish to pursue their claims and causes of action, individually.

## STATEMENT OF GENERAL FACTS

43.      Uber is a car service established in 2009 in California, that has engaged thousands of drivers across various states, including Texas, to transport riders through its Uber Black, Uber Select, and UberX services. It provides this car service in cities throughout the country via an on-demand dispatch system that only it controls. Uber offers customers the ability to hail a car-service driver on a mobile phone application and its website has advertised that "Uber is your on-demand private driver." Uber relies entirely on individuals such as the Named and putative Plaintiffs, who it classifies as independent contractors, to perform the transportation service that is not only at the heart of its business but its only business and the business it is recognized worldwide as providing. To put it bluntly, without drivers such as Plaintiffs, Uber would not exist.

44.      All UberX drivers are required to agree to the terms of a form contract, which governs their terms and conditions of their employment. In order to access the form, the drivers must use a smartphone or electronic device.  Upon accessing the Uber Driver App, Plaintiffs are then capable of being summoned by passengers/customers. But without any advance notice and

on numerous occasions since first offering the service in Texas, Uber has presented the Plaintiffs and all drivers through this mobile phone application with a new, revised form contract all drivers are then required to sign. Without pressing the button indicating an agreement with all the terms, the drivers cannot be summoned by passengers and thus earn an income. These agreements consistently state one way or another that Uber reserves the right to withhold or revoke its approval and authorization of any Driver at any time, in its sole and unreviewable discretion. Pursuant to the agreements, all drivers are required to maintain a valid driver's license and all licenses, permits, and other legal prerequisites necessary to perform transportation services and to update those documents as necessary. The agreements require that while signed in to drive for Uber, drivers must perform transportation services only for Uber and they cannot display on their vehicles any removable insignia provided by third-party transportation service providers, or other lead generation providers. The agreements further require that drivers' vehicle models be no more than ten years old, though Uber's representatives will often refuse to allow plenty of far newer vehicles from being used as Uber cars. The agreements reference "Uber's star rating system" and note that drivers "with low ratings may be limited in their right to accept Requests." The terms of the form agreements are identical, or substantially similar, for every UberX driver.

45.   Uber Black and Uber Select drivers have also been required to sign and agree to similar agreements with Uber. These agreements give Uber the right to terminate the agreements automatically, without any notice requirement, at such "moment when the Transportation Company and/or its Drivers no longer qualifies, under the applicable law or the quality standards of Uber, to provide the Driving Service or to operate the Vehicle." These agreements also provide that Uber will receive a "Fee per Ride" which "is calculated as a percentage of each Fare" and "which shall be set by Uber at Uber's sole discretion based upon local market factors and may be

subject to change." As with all Uber drivers, these drivers must also maintain a minimum star rating. All drivers also agree to submit to a background check and maintain a valid driver's license "and all licenses, permits, and other legal prerequisites necessary" to perform commercial transportation services.

46.     No one but Uber calculates all fares. The drivers have no ability to negotiate the rates or prices charged to customers or the percentage of the fare retained by Uber. The general manager of each city has the discretion to set the pricing for the various Uber "platforms" of UberX, Uber Black, and Uber Select. Whenever a customer takes a ride, Uber handles the billing of the customer's credit card and remits the driver's share, less the amount of its own commission, and any other fees or expenses Uber decides to collect directly from the driver. With respect to Uber Black drivers who might drive through an intermediary transportation companies, Uber remits the driver's share to the intermediary company, which may or may not deduct additional amounts before passing the rest of the fare on to the driver.

47.     Plaintiffs and others similarly situated applied for and were accepted by Uber to become drivers in the State of Texas for Uber pursuant to the terms and conditions of the agreements between them, which agreements Plaintiffs and other similarly situated were required to execute and enter into if they wanted to become drivers for Uber.

48.     Although classified as independent contractors, Uber drivers are employees. Uber requires its drivers to pass background checks, to accept a certain percentage of ride requests, to maintain high levels of customer satisfaction, and in some cases to pass tests on city knowledge and professionalism. If a driver fails to meet all these requirements, or engages in behavior Uber does not deem appropriate, Uber reserves the power to unilaterally, and in its own discretion, suspend their ability to drive or to terminate them permanently by "deactivating" their account. To

use Uber, a rider hails a driver by using the Uber App on their phone, and the on-duty Uber driver that is nearest to them is notified. The driver is able to see where the passenger wants to be picked up but has no information about where they are going. Thus, a driver cannot decide to decline a ride based on where a passenger is going.  If the driver accepts the ride and then cancels upon learning of the passenger's destination, the driver can be subject to termination. Once the driver accepts the request by tapping a button on their phone, they drive to the passenger's pick-up location and tap another button to indicate they are arriving. The driver then picks up the passenger and hits a button to "Begin Trip," drives the passenger to their destination, and hits another button to "End Trip" when they have reached the passenger's destination.  Uber collects the payment from the passenger, takes its fee, and then distributes the driver's share to the driver. Drivers are paid via direct deposit to their bank account on a weekly basis.  Uber determines the amount of the fares, and drivers have no ability to negotiate their own pay with customers or with Uber. Fares are calculated based on a minimum fare, plus a per minute fee when the car is moving less than 11 mph and a per mile fee when the car is moving more than 11 mph. Fares vary depending on the type of service being utilized and the location, but fares for UberBlack are typically higher. Uber can unilaterally change its formula for calculating fares at any time, thereby determining the drivers' rate of pay. Uber's system also allows it to track when a driver is on-duty or off-duty. Uber monitors how many drivers are on-duty at a given time and sends frequent messages to encourage drivers to go on-duty and transport customers at times of high demand or when there are not enough drivers on the road.

49.     There is no doubt that Uber carefully monitors and controls drivers' performance. Indeed, Uber's agreement with UberBlack drivers states that "Uber may terminate this Agreement automatically, without any notice requirement, at such moment when the Transportation Company

and/or its Drivers no longer qualifies, under the applicable law or the quality standards of Uber, to provide the Driving Service or to operate the Vehicle." Uber informs its drivers that it "looks at" various metrics to "evaluate drivers," such as their acceptance rate, cancellation rate, how consistently a driver meets their estimated time of arrival, and the driver's vehicle quality and customer ratings. Drivers also receive customer ratings in the form of "star ratings" at the end of every trip. These ratings are out of 5 stars, with 5 stars being the highest rating and 1 star being the lowest. Uber utilizes this real-time feedback about drivers to monitor drivers and decide when a driver may need to be terminated. Whether a driver will be suspended or deactivated based on a particular star rating is subject to the Uber city manager's discretion, and standards vary by city and location and may even change week to week. Uber also exercises discretion when determining whether to give drivers a second chance or to permanently terminate them, in some instances requiring a driver to take a class or asking a driver to reflect on "how they will improve" and why they "deserve another chance."

50.     Drivers also constantly receive emails from Uber, advising them about how to improve their ratings so as not to be deactivated or where to locate themselves to get customers, and warning them if they are at risk of suspension or deactivation for various reasons, including customer complaints, low customer ratings, canceling too many rides, or for failing to accept enough rides while "on-duty." Uber often refers drivers to training videos on its website to "refresh your knowledge on Uber's best practices." Uber alerts drivers about the drivers' driving practices, such as whether the speed is too high or too low, or whether the driver is pressing on the breaks too harshly. Uber also instructs drivers on vehicle cleanliness, proper appearance, and specific instructions on how to pick up riders. ("make sure to open the door for your client," "always ask them about the temperature and if they have a preferred radio station," and "make sure the radio is

off or on soft jazz or NPR"); (have a "clean rear seat, fresh un-opened waters, clean carpets, no clutter, no papers in visor, front seat forward," and warning against "jeans, un-tucked shirt, sneakers"). While these "best practices" are couched as "suggestions", a driver's failure to comply with them can lead to their termination. For example, Uber has the power and discretion to suspend drivers from driving for Uber, or to terminate drivers permanently for number of reasons, such as for accepting or soliciting cash tips, for having a dispatch acceptance rate that is too low, for asking the rider for a direct reimbursement for a cleaning fee rather than going through Uber to get reimbursed after a rider has left a mess in the car, for customer ratings that have fallen below the minimum threshold Uber allows, and for calling a client to check where their destination is, and then canceling the trip.

51.     In addition, Uber is in the business of providing car service to customers, and that is the service that Uber drivers provide. The drivers' services are fully integrated into Uber's business, and without the drivers, Uber' s business would not exist. It is only through the use of Uber's mobile phone application that Named Plaintiffs and others similarly situated are provided with individuals and fares to pick up. As stated herein, Uber sets the amount of each fare with no input by the drivers. Moreover, Uber unilaterally determines how each fare is split between Uber and the drivers. Uber maintains records concerning the drivers to include GPS records, mileage and time records, and number of fares. While a driver may decide when to turn on his app, he has no input over what passengers he is forced to pick up, regardless of location, expected revenue, passenger behavior, etc. Nor can the driver avoid turning on the app for too long without Uber threatening suspension or termination. Finally, the agreements required by Uber in order to become an Uber driver are prepared by Uber and are what is known as contracts of adhesion. The drivers

have no input into the content of the agreement and are left with no choice but to agree to the form if they want to drive for Uber.

52.     However, and notwithstanding the amount of control Uber has over the drivers and their ability to drive for Uber, Uber intentionally and unlawfully misclassifies the drivers as independent contractors. Uber drivers are guaranteed no hourly wage or compensation for overtime work, which most drivers are forced to accept just to eke out a small profit above their costs. Uber drivers are required to bear many of the expenses of their employment, including expenses for their vehicles, gas, additional commercial insurance, as well as other expenses such as city permit fees. Moreover, Uber benefits from the additional qualifications some of their Uber Select and Uber Black drivers provide such as additional commercial insurance and the ability to pick up passengers at local airports, all of which cost the drivers which costs are not reimbursed or even shared by Uber. Finally, by misclassifying its drivers as independent contractors, Uber absolves itself of the requirement to pay to the various states and the federal government the state and federal withholdings an employer typically pays from the withholdings collected from an employee's pay.

## **FACTUAL ALLEGATIONS**

### A.     **Plaintiff ALADDIN AFIA**

53.     In September of 2015, Mr. Afia began working for Uber and continues to work for Uber as a driver.

54.     On average, Mr. Afia drove 60-70 hours per week throughout his employment with Uber. Uber compensates its drivers weekly. Uber takes 20% of the total fares and the driver receives the remaining 80%. Because Plaintiff was improperly classified as an independent contractor, he had to pay all employment related expenses (*i.e.*, gas, car repairs, car payments,

parking, and insurance) which on a weekly basis averages $417.00. The minimum wage in Texas during the relevant time period was $7.25. The federal minimum wage was also $7.25. Uber failed to pay minimum wage or overtime (1.5 times minimum wage).

55.     For example, during the week of September 7, 2015, Mr. Afia worked (*i.e.*, was logged on to the Uber application for) 74.47 hours and was compensated $854.04. After paying his employment related expenses that week, Mr. Afia earned just $437.04, resulting in an effective hourly wage of $5.87, well below Texas' and the federal minimum wage. He also received no overtime compensation.

56.     For example, during the week of January 4, 2016, Mr. Afia worked (*i.e.*, was logged on to the Uber application for) 112.78 hours and was compensated $688.32. After paying his employment related expenses that week, Mr. Afia earned just $271.32, resulting in an effective hourly wage of $2.41, well below Texas' and the federal minimum wage. He also received no overtime compensation.

57.     For example, during the week of June 6, 2016, Mr. Afia worked (*i.e.*, was logged on to the Uber application for) 126.75 hours and was compensated $992.68. After paying his employment related expenses that week, Mr. Afia earned just $575.68, resulting in an effective hourly wage of $4.54, well below Texas' and the federal minimum wage. He also received no overtime compensation.

58.     For example, during the week of August 1,2016, Mr. Afia worked (*i.e.*, was logged on to the Uber application for) 152.03 hours and was compensated $815.41. After paying his employment related expenses that week, Mr. Afia earned just $398.41, resulting in an effective hourly wage of $2.62, well below Texas' and the federal minimum wage. He also received no overtime compensation.

59. For example, during the week of August 29, 2016, Mr. Afia worked (*i.e.*, was logged on to the Uber application for) 150.55 hours and was compensated $463.38. After paying his employment related expenses that week, Mr. Afia earned just $46.38, resulting in an effective hourly wage of $0.31, well below Texas' and the federal minimum wage. He also received no overtime compensation.

60. Additionally, for nine (9) weeks between the time period November 7, 2016 and November 6, 2017, Mr. Afia worked (*i.e.*, was logged on to the Uber application for) in excess of 140-150 hours per week and was compensated less than his weekly expenses, effectively working for nothing these many weeks. He also received no overtime compensation.

**B.     Plaintiff ANDREW MICHAEL BERMAN**

61. In October 2014, Mr. Berman began working for Uber and continues to work for Uber as a driver.

62. On average, Mr. Berman drove 40-50 hours per week throughout his employment with Uber. Uber compensates its drivers weekly. Uber takes 20% of the total fares and the driver receives the remaining 80%. Because Plaintiff was improperly classified as an independent contractor, he had to pay all employment related expenses (*i.e.*, gas, car repairs, car payments, parking, and insurance) which on a weekly basis averages $248.00. The minimum wage in Texas during the relevant time period was $7.25. The federal minimum wage was also $7.25. Uber failed to pay minimum wage or overtime (1.5 times minimum wage).

63. For example, during the week of November 24, 2014, Mr. Berman worked (*i.e.*, was logged on to the Uber application for) 79.75 hours and was compensated $228.72. After paying his employment related expenses that week, Mr. Berman did not even realize any net earnings therefore falling well below Texas' and the federal minimum wage. He also received no

overtime compensation.

64.     For example, during the week of December 8, 2014, Mr. Berman worked (*i.e.*, was logged on to the Uber application for) 71.97 hours and was compensated $356.39. After paying his employment related expenses that week, Mr. Berman earned just $108.39, resulting in an effective hourly wage of $1.51, well below Texas' and the federal minimum wage. He also received no overtime compensation.

65.     For example, during the week of January 19, 2015, Mr. Berman worked (*i.e.*, was logged on to the Uber application for) 64.88 hours and was compensated $581.09. After paying his employment related expenses that week, Mr. Berman earned just $333.09, resulting in an effective hourly wage of $5.13, well below Texas' and the federal minimum wage. He also received no overtime compensation.

66.     For example, during the week of May 9, 2016, Mr. Berman worked (*i.e.*, was logged on to the Uber application for) 24.62 hours and was compensated $388.28. After paying his employment related expenses that week, Mr. Berman earned just $140.28, resulting in an effective hourly wage of $5.70, well below Texas' and the federal minimum wage.

C.      **Plaintiff DAWIT GEBREMARIAM**

67.     In November 2014, Mr. Gebremariam began working for Uber and continues to work for Uber as a driver.

68.     On average, Mr. Gebremariam drove 40-50 hours per week throughout his employment with Uber. Uber compensates its drivers weekly. Uber takes 20% of the total fares and the driver receives the remaining 80%. Because Plaintiff was improperly classified as an independent contractor, he had to pay all employment related expenses (*i.e.*, gas, car repairs, car payments, parking, and insurance) which on a weekly basis averages $276.00. The minimum wage

in Texas during the relevant time period was $7.25. The federal minimum wage was also $7.25. Uber failed to pay minimum wage or overtime (1.5 times minimum wage).

69.     For example, during the week of December 22, 2014, Mr. Gebremariam worked (*i.e.*, was logged on to the Uber application for) 18.77 hours and was compensated $322.47. After paying his employment related expenses that week, Mr. Gebremariam earned just $46.47, resulting in an effective hourly wage of $2.48, well below Texas' and the federal minimum wage.

70.     For example, during the week of February 1, 2016, Mr. Gebremariam worked (*i.e.*, was logged on to the Uber application for) 53.80 hours and was compensated $589.09. After paying his employment related expenses that week, Mr. Gebremariam earned just $313.09, resulting in an effective hourly wage of $5.82, well below Texas' and the federal minimum wage. He also received no overtime compensation.

71.     For example, during the week of January 23, 2017, Mr. Gebremariam worked (*i.e.*, was logged on to the Uber application for) 56.87 hours and was compensated $504.85. After paying his employment related expenses that week, Mr. Gebremariam earned just $228.85, resulting in an effective hourly wage of $4.02 well below Texas' and the federal minimum wage. He also received no overtime compensation.

72.     For example, during the week of June 19, 2017, Mr. Gebremariam worked (*i.e.*, was logged on to the Uber application for) 21.57 hours and was compensated $307.45. After paying his employment related expenses that week, Mr. Gebremariam earned just $31.45, resulting in an effective hourly wage of $1.46, well below Texas' and the federal minimum wage.

73.     For example, during the week of February 26, 2018, Mr. Gebremariam worked (*i.e.*, was logged on to the Uber application for) 50.55 hours and was compensated $503.33. After paying his employment related expenses that week, Mr. Gebremariam earned just $227.33,

resulting in an effective hourly wage of $4.50, well below Texas' and the federal minimum wage. He also received no overtime compensation.

74.     For example, during the week of April 9, 2018, Mr. Gebremariam worked (*i.e.*, was logged on to the Uber application for) 40.37 hours and was compensated $306.95. After paying his employment related expenses that week, Mr. Gebremariam earned just $30.95, resulting in an effective hourly wage of $0.77, well below Texas' and the federal minimum wage. He also received no overtime compensation.

### D.     Plaintiff ASHAGARI HABTEGABRIEL

75.     In February 2015, Mr. Habtegabriel began working for Uber and continues to work for Uber as a driver.

76.     On average, Mr. Habtegabriel drove 40-50 hours per week throughout his employment with Uber. Uber compensates its drivers weekly. Uber takes 20% of the total fares and the driver receives the remaining 80%. Because Plaintiff was improperly classified as an independent contractor, he had to pay all employment related expenses (*i.e.*, gas, car repairs, car payments, parking, and insurance) which on a weekly basis averages $323.00. The minimum wage in Texas during the relevant time period was $7.25. The federal minimum wage was also $7.25. Uber failed to pay minimum wage or overtime (1.5 times minimum wage).

77.     For example, during the week of April 25, 2016, Mr. Habtegabriel worked (*i.e.*, was logged on to the Uber application for) 48.77 hours and was compensated $605.41. After paying his employment related expenses that week, Mr. Habtegabriel earned just $282.41, resulting in an effective hourly wage of $5.79, well below Texas' and the federal minimum wage. He also received no overtime compensation.

78.     For example, during the week of August 29, 2016, Mr. Habtegabriel worked (*i.e.*,

was logged on to the Uber application for) 56.45 hours and was compensated $574.61. After paying his employment related expenses that week, Mr. Habtegabriel earned just $251.61, resulting in an effective hourly wage of $4.46, well below Texas' and the federal minimum wage. He also received no overtime compensation.

79.     For example, during the week of January 16, 2017, Mr. Habtegabriel worked (*i.e.*, was logged on to the Uber application for) 43.45 hours and was compensated $510.65. After paying his employment related expenses that week, Mr. Habtegabriel earned just $187.65, resulting in an effective hourly wage of $4.32 well below Texas' and the federal minimum wage. He also received no overtime compensation.

80.     For example, during the week of March 27, 2017, Mr. Habtegabriel worked (*i.e.*, was logged on to the Uber application for) 41.03 hours and was compensated $442.95. After paying his employment related expenses that week, Mr. Habtegabriel earned just $119.95, resulting in an effective hourly wage of $2.92, well below Texas' and the federal minimum wage. He also received no overtime compensation.

81.     For example, during the week of August 7, 2017, Mr. Habtegabriel worked (*i.e.*, was logged on to the Uber application for) 51.85 hours and was compensated $585.52. After paying his employment related expenses that week, Mr. Habtegabriel earned just $262.52, resulting in an effective hourly wage of $5.06, well below Texas' and the federal minimum wage. He also received no overtime compensation.

82.     For example, during the week of February 26, 2018, Mr. Habtegabriel worked (*i.e.*, was logged on to the Uber application for) 35.62 hours and was compensated $495.72. After paying his employment related expenses that week, Mr. Habtegabriel earned just $172.72, resulting in an effective hourly wage of $4.85, well below Texas' and the federal minimum wage.

E.      **Plaintiff MICHAEL LEYZERZON**

83.     In August 2014, Mr. Leyzerzon began working for Uber and continues to work for Uber as a driver.

84.     On average, Mr. Leyzerzon drove 20 hours per week throughout his employment with Uber. Uber compensates its drivers weekly. Uber takes 20% of the total fares and the driver receives the remaining 80%. Because Plaintiff was improperly classified as an independent contractor, he had to pay all employment related expenses (*i.e.*, gas, car repairs, car payments, parking, and insurance) which on a weekly basis averages $160.00. The minimum wage in Texas during the relevant time period was $7.25. The federal minimum wage was also $7.25. Uber failed to pay minimum wage or overtime (1.5 times minimum wage).

85.     For example, during the week of November 23, 2015, Mr. Leyzerzon worked (*i.e.*, was logged on to the Uber application for) 10 hours and was compensated $224.72. After paying his employment related expenses that week, Mr. Leyzerzon earned just $64.72, resulting in an effective hourly wage of $6.47, well below Texas' and the federal minimum wage.

86.     For example, during the week of February 8, 2016, Mr. Leyzerzon worked (*i.e.*, was logged on to the Uber application for) 3.87 hours and was compensated $181.17. After paying his employment related expenses that week, Mr. Leyzerzon earned just $21.17, resulting in an effective hourly wage of $5.47, well below Texas' and the federal minimum wage.

87.     For example, during the week of May 30, 2016, Mr. Leyzerzon worked (*i.e.*, was logged on to the Uber application for) 7.85 hours and was compensated $170.31. After paying his employment related expenses that week, Mr. Leyzerzon earned just $10.31, resulting in an effective hourly wage of $1.33, well below Texas' and the federal minimum wage.

88.     For example, during the week of August 29, 2016, Mr. Leyzerzon worked (*i.e.*, was

logged on to the Uber application for) 4 hours and was compensated $174.29. After paying his employment related expenses that week, Mr. Leyzerzon earned just $14.29, resulting in an effective hourly wage of $3.57, well below Texas' and the federal minimum wage.

89.     For example, during the week of December 25, 2017, Mr. Leyzerzon worked (*i.e.*, was logged on to the Uber application for) 27.25 hours and was compensated $229.96. After paying his employment related expenses that week, Mr. Leyzerzon earned just $69.96, resulting in an effective hourly wage of $2.57, well below Texas' and the federal minimum wage.

90.     Additionally, for numerous weeks during his employment, Mr. Leyzerzon did not make enough gross earnings to cover his weekly expenses, effectively working for nothing these many weeks. He also received no overtime compensation.

## F.     Plaintiff ROBERT NIETO

91.     In June 2016, Mr. Nieto began working for Uber and continues to work for Uber as a driver.

92.     On average, Mr. Nieto drove 50-60 hours per week throughout his employment with Uber. Uber compensates its drivers weekly. Uber takes 20% of the total fares and the driver receives the remaining 80%. Because Plaintiff was improperly classified as an independent contractor, he had to pay all employment related expenses (*i.e.*, gas, car repairs, car payments, parking, and insurance) which on a weekly basis averages $300.00. The minimum wage in Texas during the relevant time period was $7.25. The federal minimum wage was also $7.25. Uber failed to pay minimum wage or overtime (1.5 times minimum wage).

93.     For example, during the week of September 5, 2016, Mr. Nieto worked (*i.e.*, was logged on to the Uber application for) 62.30 hours and was compensated $696.59. After paying his employment related expenses that week, Mr. Nieto earned just $396.59, resulting in an

effective hourly wage of $6.37, well below Texas' and the federal minimum wage. He also received no overtime compensation.

94.     For example, during the week of October 3, 2016, Mr. Nieto worked (*i.e.*, was logged on to the Uber application for) 62.93 hours and was compensated $563.21. After paying his employment related expenses that week, Mr. Nieto earned just $262.21, resulting in an effective hourly wage of $4.18, well below Texas' and the federal minimum wage. He also received no overtime compensation.

95.     For example, during the week of November 21, 2016, Mr. Nieto worked (*i.e.*, was logged on to the Uber application for) 86.97 hours and was compensated $785.12. After paying his employment related expenses that week, Mr. Nieto earned just $485.12, resulting in an effective hourly wage of $5.58, well below Texas' and the federal minimum wage. He also received no overtime compensation.

96.     For example, during the week of January 16, 2017, Mr. Nieto worked (*i.e.*, was logged on to the Uber application for) 77.87 hours and was compensated $628.38. After paying his employment related expenses that week, Mr. Nieto earned just $328.38, resulting in an effective hourly wage of $4.22, well below Texas' and the federal minimum wage. He also received no overtime compensation.

97.     For example, during the week of April 10, 2017, Mr. Nieto worked (*i.e.*, was logged on to the Uber application for) 91.12 hours and was compensated $664.59. After paying his employment related expenses that week, Mr. Nieto earned just $364.59, resulting in an effective hourly wage of $4.00, well below Texas' and the federal minimum wage. He also received no overtime compensation.

98.     For example, during the week of April 24, 2017, Mr. Nieto worked (*i.e.*, was logged

on to the Uber application for) 62.23 hours and was compensated $340.05. After paying his employment related expenses that week, Mr. Nieto earned just $40.05, resulting in an effective hourly wage of $0.64, well below Texas' and the federal minimum wage. He also received no overtime compensation.

## G.    Plaintiff EUGENE RODRIGUEZ

99.    In December 2014, Mr. Rodriguez began working for Uber and continues to work for Uber as a driver.

100.    On average, Mr. Rodriguez drove 25-35 hours per week throughout his employment with Uber. Uber compensates its drivers weekly. Uber takes 20% of the total fares and the driver receives the remaining 80%. Because Plaintiff was improperly classified as an independent contractor, he had to pay all employment related expenses (*i.e.*, gas, car repairs, car payments, parking, and insurance) which on a weekly basis averages $195.00. The minimum wage in Texas during the relevant time period was $7.25. The federal minimum wage was also $7.25. Uber failed to pay minimum wage or overtime (1.5 times minimum wage).

101.    For example, during the week of December 22, 2014, Mr. Rodriguez worked (*i.e.*, was logged on to the Uber application for) 22.97 hours and was compensated $298.81. After paying his employment related expenses that week, Mr. Rodriguez earned just $103.81, resulting in an effective hourly wage of $4.52, well below Texas' and the federal minimum wage.

102.    For example, during the week of March 9, 2015, Mr. Rodriguez worked (*i.e.*, was logged on to the Uber application for) 20.42 hours and was compensated $296.34. After paying his employment related expenses that week, Mr. Rodriguez earned just $101.34, resulting in an effective hourly wage of $4.96, well below Texas' and the federal minimum wage.

103.    For example, during the week of July 6, 2015, Mr. Rodriguez worked (*i.e.*, was

logged on to the Uber application for) 21.13 hours and was compensated $270.78. After paying his employment related expenses that week, Mr. Rodriguez earned just $75.78, resulting in an effective hourly wage of $3.59, well below Texas' and the federal minimum wage.

104.    For example, during the week of November 6, 2017, Mr. Rodriguez worked (*i.e.*, was logged on to the Uber application for) 18.08 hours and was compensated $282.40. After paying his employment related expenses that week, Mr. Rodriguez earned just $87.40, resulting in an effective hourly wage of $4.83, well below Texas' and the federal minimum wage.

105.    For example, during the week of December 11, 2017, Mr. Rodriguez worked (*i.e.*, was logged on to the Uber application for) 16.23 hours and was compensated $215.67. After paying his employment related expenses that week, Mr. Rodriguez earned just $20.67, resulting in an effective hourly wage of $1.27, well below Texas' and the federal minimum wage.

106.    For example, during the week of June 11, 2018, Mr. Rodriguez worked (*i.e.*, was logged on to the Uber application for) 17.45 hours and was compensated $204.31. After paying his employment related expenses that week, Mr. Rodriguez earned just $9.31, resulting in an effective hourly wage of $0.53, well below Texas' and the federal minimum wage.

107.    Additionally, for numerous weeks during his employment, Mr. Rodriguez did not make enough gross earnings to cover his weekly expenses, effectively working for nothing these many weeks.

**H.    Plaintiff JEROD SLAY**

108.    In June 2014, Mr. Slay began working for Uber and continues to work for Uber as a driver.

109.    On average, Mr. Slay drove 25-35 hours per week throughout his employment with Uber. Uber compensates its drivers weekly. Uber takes 20% of the total fares and the driver

receives the remaining 80%. Because Plaintiff was improperly classified as an independent contractor, he had to pay all employment related expenses (*i.e.*, gas, car repairs, car payments, parking, and insurance) which on a weekly basis averages $73.00. The minimum wage in Texas during the relevant time period was $7.25. The federal minimum wage was also $7.25. Uber failed to pay minimum wage or overtime (1.5 times minimum wage).

110.    For example, during the week of March 30, 2015, Mr. Slay worked (*i.e.*, was logged on to the Uber application for) 14.47 hours and was compensated $122.06. After paying his employment related expenses that week, Mr. Slay earned just $49.06, resulting in an effective hourly wage of $3.39, well below Texas' and the federal minimum wage.

111.    For example, during the week of September 14, 2015, Mr. Slay worked (*i.e.*, was logged on to the Uber application for) 8.52 hours and was compensated $81.32. After paying his employment related expenses that week, Mr. Slay earned just $8.32, resulting in an effective hourly wage of $0.98, well below Texas' and the federal minimum wage.

112.    For example, during the week of October 26, 2015, Mr. Slay worked (*i.e.*, was logged on to the Uber application for) 12.68 hours and was compensated $103.28. After paying his employment related expenses that week, Mr. Slay earned just $30.28, resulting in an effective hourly wage of $2.39, well below Texas' and the federal minimum wage.

113.    For example, during the week of January 11, 2016, Mr. Slay worked (*i.e.*, was logged on to the Uber application for) 23.23 hours and was compensated $78.31. After paying his employment related expenses that week, Mr. Slay earned just $5.31, resulting in an effective hourly wage of $0.23, well below Texas' and the federal minimum wage.

114.    Additionally, for numerous weeks during his employment, Mr. Slay did not make enough gross earnings to cover his weekly expenses, effectively working for nothing these many

weeks.

115.    All Plaintiffs distinctly remember numerous instances like the above examples when they worked more than 40 hours per week and Uber failed to pay them overtime even before expenses were taken into consideration. Plaintiffs also remember numerous instances where they worked 40 hours or less per week and Uber failed to pay them minimum wage even before expenses were taken into consideration. Indeed, to the best of their recollection, Plaintiffs routinely worked more than 40 hours per week and never received time and one-half pay for working more than 40 hours.

116.    Plaintiffs lack adequate records, which Uber is required to maintain, to provide more exact dates and details. Uber's failure to maintain such records is a violation of the FLSA. Because Plaintiffs and other Uber Drivers are paid by the ride and have been required to bear many of the expenses of their employment, their weekly pay rates have fallen below minimum wage in virtually all weeks. They also have not received overtime compensation for time spent working beyond 40 hours per week.

## <u>CAUSES OF ACTION</u>

### <u>Breach of Contract – Toll Charges and Gratuities</u>

117.    Plaintiffs incorporate herein by reference the factual statements set out in Paragraphs 1 through 116.

118.    Plaintiffs further bring claims for Uber's breach of the express contractual agreements in place between the parties for all unpaid gratuities and toll charges. Pursuant to Paragraph 4.1 of the TSA, Uber has contractually agreed with Plaintiffs that if they (Plaintiffs) incur toll charges during the course of passenger's ride, Uber will reimburse Plaintiffs the full amount of the toll charges. The agreements explicitly state that Uber will collect from the

passengers those applicable toll charges that Plaintiffs incur and then remit to Plaintiffs those tolls collected from the passengers in full. However, that is not the case. Uber charges the passengers the full toll charge when calculating their fare that is charged to their credit cards. These are charges that Plaintiffs incur from the toll authorities which in turn should be reimbursed in full to them by Uber and not included in the calculation Uber applies when determining the percentage of each collected fare that is to be paid to Plaintiffs. In other words, and irrespective of what the applicable percentage of each fare collected that Uber is contractually allowed to retain, the full amount of any and all toll charges charged to Plaintiffs and collected from the riders is supposed to be paid to Plaintiffs 100%. On numerous occasions, Plaintiffs have not received any, or only received a partial reimbursement for these toll charges in total contravention of Uber's representations and the agreements in place to fully reimburse Plaintiffs for these toll charges. Uber has not performed as required under the relevant TSA's in that it has failed to fully reimburse Plaintiffs those toll charges they have incurred. As a direct and proximate result of said breaches by Uber, Plaintiffs have been damaged for which they seek recovery.

119.    Additionally, Uber now allows passengers to include gratuities in their payments pursuant to the "Tipping Addendum" that went into effect on or about June 20, 2017. Pursuant to this Addendum, **"Gratuities paid to you by a Rider are your property and shall be remitted to you along with Fares and other amounts (e.g., Tolls, taxes, fees, etc.) that you are entitled to receive for your Rides (collectively, "*Driver Funds*")** (emphasis in original). However, recent actions by Uber clearly indicate that while it collects the gratuities paid by the passengers, it only forwards a portion of those gratuities to Plaintiffs, therefore wrongfully retaining monies that do not belong to it and therefore breaching the terms and provisions of this Addendum. Clearly, by not remitting the full gratuity paid by a rider to Plaintiffs, Uber has breached this express

contractual agreement which is what Plaintiffs are alleging. Accordingly, Plaintiffs seek to recover from Uber the full amounts of gratuities paid to them but wrongfully withheld by Uber.

### Breach of Contract – Excessive Service Fees

120. Plaintiffs incorporate herein by reference the factual statements set out in Paragraphs 1 through 119.

121. At issue relative to this cause of action are two sections of the TSA, Section 4.1 and 4.4, and Uber's January 2015 Addendum applicable to the Houston area, all of which pertain to how much of each fare Uber is allowed to retain. Uber has consistently increased the amount of service fees it charges Plaintiffs that are collected from each fare paid by the riders and then used to determine the amount of renumeration to be paid to Plaintiffs. Pursuant to Section 4.1 of the TSA, the fare charged the passenger is calculated on a base fare amount plus distance as determined by Uber using location-based services enabled through Plaintiffs' smartphone (another clear example of control exercised by Uber as an employer) and/or time amounts as detailed in Uber's website for the Houston territory. Clearly, Uber has the unilateral authority to increase and revise the amount of service fees it charges and which Plaintiffs have no ability whatsoever to negotiate, another example of Uber's controlling "take it or leave" approach to its contractual control over Plaintiffs. Instead of adhering to its own agreements, Uber has developed a way to charge higher rates to its passengers by charging increased service fees which then are not included in the calculation of payments to Plaintiffs. Effectively, Uber blatantly refuses to use these higher rates in the form of excessive service fees when calculating Plaintiffs' compensation pursuant to the percentage-based fee agreement in place between the parties.

122. Section 4.4 of the TSA specifically states that Plaintiffs will pay Uber a service fee:

> "**Service Fee**. In consideration of Company's provision of the Driver App
> and the Uber Services for your use and benefit hereunder, you agree to pay
> Company a service fee on a per Transportation Services transaction basis
> calculated as a percentage of the Fare determined by the Fare Calculation
> (regardless of any Negotiated Fare), as provided to you via email or
> otherwise made available electronically by Company from time to time for
> the applicable Territory ("*Service Fee*")."

The Fare Calculation is specified in Section 4.1 as set out above - fare is calculated on a base fare amount plus distance as determined by Uber. The January 2015 Addendum applicable to Houston sets Uber's percentage of the fare to be paid for its service fee as 20% for UberX and presumably 28% for UberBlack. This is also the percentage applicable to both UberSelect and Uber XL, both higher classifications than UberX. In other words, according to the language of the TSA and the January 2015 Addendum specific to Houston, both of which are unilaterally determined and drafted by Uber and which Plaintiffs have no ability to negotiate, Uber is limited to these percentages of each total fare as payment for its services. Therefore, any amount retained by Uber in excess of these percentages is not allowed by the plain language of the agreements and therefore constitutes a breach of these agreements.

123.    Uber breached the TSA, the Houston Addendum, and their fixed compensation schemes by retaining a larger percentage of each fare by charging higher service fees to its passengers but then not including these higher service fees in the calculation of the total fare amount pursuant to the TSA and the applicable addendums. This effectively breaches the TSA by altering the percentage-based breakdown of fares between Plaintiffs' remittances and Uber's service fees with the end result being that Uber retains a larger percentage of each fare that it is

contractually allowed by the TSA's to retain, which is between 20% and 28% per the express language of the agreements it has in place between it and Plaintiffs. Accordingly, Uber breached the agreements in place between the parties. Plaintiffs are seeking reimbursement from Uber of the wrongfully retained monies based upon the exorbitant and unlawful service fees charged them in violation and breach of the agreements in place between the parties.

124. Additionally, Plaintiffs and Uber executed the TSA and all applicable addendums. Through these agreements, Uber procured Plaintiffs' driving services. These driving services constitute adequate consideration between the parties and Plaintiffs have performed the driving services outlined in these agreements. Section 4.1 of the TSA addresses the "Fare Calculation" and payment of drivers and also designates Uber as Plaintiffs' payment collection agent. Section 4.4 of the TSA governs the "Service Fee" that Uber charges drivers, including Plaintiffs. Under the TSA, there is one fare: passengers pay it to Plaintiffs with Uber acting as Plaintiffs' agent by collecting it. Uber is supposed to deduct its service fee from the fare and then remit the balance to Plaintiffs. Plaintiffs actually do pay Uber a service fee for it to act as their payment collection agent for purposes of collecting the fare on their behalf. All money that passengers pay for a ride, minus Uber's service fee, belongs to Plaintiffs. Consequently, Plaintiffs have performed as required pursuant to the agreements in place between the parties. Uber has not, instead breaching the agreements as set forth above and retaining more from each fare than it is contractually allowed to.

## **JURY DEMAND**

125. Plaintiffs and all others similarly situated request a trial by jury on all of their claims.

WHEREFORE PREMISES CONSIDERED, Plaintiffs and all others similarly situated request that this Court certify this case as a class action, pursuant to Fed. R. Civ. P. 23; award restitution for all charged gratuities which were not remitted to the drivers; award reimbursement that the drivers who were misclassified as independent contractors were required to bear; award pre- and post-judgment interest; award reasonable attorneys' fees, costs, and expenses; and award any other relief to which the Plaintiffs may be entitled.

## **PRAYER**

Plaintiffs pray for relief as follows:

a.    Judgment against Uber for an amount equal to Plaintiffs' unpaid hourly wages and overtime;

b.    Judgment against Uber finding that its violations of the FLSA were willful.

c.    An amount equal to the unpaid wages damages as liquidated damages;

d.    A finding that Plaintiffs are employees and thereby entitled to all relevant and pertinent benefits;

e.    An award for all charges and related expenses incurred by Plaintiffs;

f.    Their actual damages for Uber's breaches of the agreements in place between the parties;

g.    Prejudgment interest;

h.    All costs, recoverable expenses and attorney's fees incurred in prosecuting these claims;

i.    For such further relief as the Court deems is just and equitable.

Respectfully submitted,

OF COUNSEL:

**LAW OFFICES OF KEVIN R. MICHAELS, P.C.**

**SEARS & CRAWFORD, LLP**
Ross A. Sears, II
State Bar No. 17960011
1200 Rothwell Street
Houston, Texas 77002
Telephone: (713) 223-3333
Facsimile: (713) 223-3331
Email: ross@searscrawford.com

By: */s/ Kevin R. Michaels*_____
        Kevin R. Michaels
        State Bar No.: 00784598
         16000 Barkers Point Lane, Suite 208
        Houston, Texas 77079
        Telephone: 281-496-9889
        Facsimile: 281-496-4211
         kmichaels@michaelslaw.net

**KLITSAS & VERCHER P.C.**
Loren G. Klitsas
Federal Bar No.: 16451
550 Westcott, Suite 550
Houston, Texas 77007
Telephone: 713-862-1365
Facsimile: 713-862-1465
klitsas@kv-law.com

**ATTORNEY-IN-CHARGE FOR PLAINTIFFS**

**THE GOLDBERG LAW OFFICE, PLLC**
Daniel J. Goldberg
TBN 24052856
2006 Commonwealth Street
Houston, Texas 77006
Telephone: 713-942-0600
Facsimile: 713-942-0601
DJG@LawGoldberg.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2018, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court. I also certify that I emailed a copy of this document to all counsel of record.

*/s/ Kevin R. Michaels*_____
Kevin R. Michaels